**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **AUBURN UNIVERSITY,** | ) | |
| an Alabama Corporation | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION NO.3:09-cv-00694-MEF** |
| | ) | |
| **v.** | ) | **ORAL ARGUMENT** |
| | ) | **REQUESTED** |
| **INTERNATIONAL BUSINESS** | ) | |
| **MACHINES CORP., a New York** | ) | |
| **Corporation** | ) | |
| | ) | |
| **Defendant.** | ) | |

**AUBURN UNIVERSITY'S REPLY IN SUPPORT OF**
**MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT[1]**

## I.    INTRODUCTION

This is a simple case of theft of the people of Alabama's property.  In 2000 and 2001, Auburn professor Adit Singh provided to IBM unpublished papers and information regarding inventions that he and his student, Thomas Barnett, had made in the field of adaptive testing. The information was provided with an understanding that IBM would not misuse it.  Upon learning that Auburn filed patent applications covering the inventions, IBM raced to the Patent Office to file applications in IBM's name covering the materials Dr. Singh had provided to IBM, without telling Auburn and without Auburn's permission.  IBM's misconduct ultimately resulted in two U.S. patents being awarded to IBM, one in 2004 and the other in 2006.

Under Alabama law, IBM is liable to Auburn for this behavior.  IBM converted Auburn's property and was unjustly enriched by obtaining the illicit patents.   *See Univ. of Colo. Found., Inc.  v. Am. Cyanamid Co.*, 342 F.3d 1298 (Fed. Cir. 2003).  As detailed by the Federal Circuit in

---

[1]  In light of the reassignment of the case and the number of briefs filed on the issue, Auburn respectfully requests oral argument on its motion for leave to file an amended complaint.

the *University of Colorado* case and in a host of other cases, so long as Auburn establishes that Auburn personnel are real inventors of the inventions claimed in the IBM patents, Auburn's state law claims are not preempted by federal patent law.

In opposing Auburn's motion to amend its complaint to cure certain defects noted by the Court in its order dismissing Auburn's original state law claims, IBM has postulated a world in which it can act with impunity to misappropriate Auburn's property.  Under IBM's view, IBM may take Auburn's information, file patent applications on it in breach of any standard of normal behavior, receive patents, benefit from those patents for years, and pay no penalty other than losing the patent rights to which it was never entitled to begin with.  That is not the law.  Rather, the law provides that, by obtaining patents on Auburn's inventions in breach of its obligations to Auburn, IBM has converted Auburn's property to IBM's benefit and is liable to Auburn for the unjust enrichment received by IBM for the years it held those patents.  In addition, Auburn is entitled to change the inventorship and ownership of the ill-gotten IBM patents.  Auburn's motion to amend should be granted and this case should proceed forthwith.

## II.    BACKGROUND

In light of the re-assignment of the case, Auburn provides a brief background of the facts of this case and the procedural history of the current motion.

### A.    Factual Background

Auburn filed this case against IBM for patent infringement, unjust enrichment and conversion on July 23, 2009.  Auburn's claims are based on IBM's theft and misappropriation of semiconductor testing technology developed by a professor at Auburn, Dr. Adit Singh, and his student, Thomas Barnett.

One of the largest costs of manufacturing computer components for large companies such as IBM is called "reliability testing."  [Doc. No. 50-2 at ¶ 3.]  Manufacturing computer

2

components without defects is difficult, and internal testing for those defects can be costly.  [*Id.*] Beginning in the mid-1990s while at Auburn, Dr. Singh was working in the field of reliability testing, and he came to know Mr. Phil Nigh, who was involved in testing at IBM's Burlington, Vermont facility.  [*Id.* at ¶ 4.]  To assist in Dr. Singh's research, Mr. Nigh began sharing IBM confidential information with Dr. Singh.  [*Id.*]  Likewise, Dr. Singh provided Mr. Nigh with certain of his confidential, unpublished research papers prior to publication.  [*Id.*]

Dr. Singh, working with one of his graduate students at Auburn, Thomas Barnett, discovered methods through which computer components can be classified based on their expected defect rate, allowing manufacturers such as IBM to quickly determine which manufactured components are most likely to fail.  [*Id.* at ¶ 5.]

IBM was so interested in this research that in 2000, while Mr. Barnett was still a graduate student at Auburn, IBM invited Auburn to nominate students for IBM Fellowships.  [*Id.* at ¶ 22.] Upon receiving this notice, Dr. Singh contacted Mr. Nigh to gauge his interest in working with Mr. Barnett.  [*Id.* at ¶ 23.]  Dr. Singh told Mr. Nigh that, if Mr. Nigh was interested, he would nominate Mr. Barnett for a fellowship.  [*Id.*]  In that same communication, Dr. Singh forwarded a copy of a paper describing Dr. Singh and Mr. Barnett's research on a yield-reliability model that had been submitted for presentation at an upcoming conference.  [*Id.*]  In response, Mr. Nigh told Dr. Singh that he should nominate Mr. Barnett for a fellowship.  [*Id.* at ¶ 24.]  Mr. Nigh said that even if Mr. Barnett did not receive a fellowship, IBM was "definitely interested" in a summer co-op position for Mr. Barnett.  [*Id.*]  After consultation with Dr. Singh, Mr. Barnett accepted IBM's invitation and spent the summer of 2001 at IBM as a summer intern at IBM's Burlington, Vermont facility, while he continued to be a graduate student at Auburn.  [*Id.* at ¶ 25.]

While at IBM, Mr. Barnett worked on validating the yield-reliability model developed by Dr. Singh and Mr. Barnett at Auburn, and disclosed this work to Mr. Nigh in an unpublished paper on that subject.  [*Id.* at ¶ 26.]  IBM was so interested in Dr. Singh and Mr. Barnett's research that IBM formed its own internal team—called the "Statistical Analysis Group"—on June 1, 2001, just weeks after Mr. Barnett arrived in Vermont.  [*Id.* at ¶ 27.]  Later that summer, IBM shared with Dr. Singh confidential test results from this team in a document marked "IBM Confidential."  [*Id.* at ¶ 28.]

Dr. Singh and Mr. Barnett's groundbreaking technology was valuable to Auburn, and Auburn filed United States patent applications on that technology in October 2001.  [*Id.* at ¶ 31.]  Shortly after they were filed, Dr. Singh disclosed the existence of these confidential patent applications to IBM.  [*Id.* at ¶ 32.]  Once IBM learned that Auburn had filed for patent protection on its inventions, IBM raced to the United States Patent Office to file its own patent applications.  IBM filed its first application on December 26, 2001, two months after Auburn filed its first applications.  [*Id.* at ¶ 33.]  Despite the fact that IBM named Mr. Barnett as an inventor on its application, IBM would not show the patent application to Mr. Barnett until after it was filed.  [*Id.* at ¶ 34.]  IBM then suggested to Mr. Barnett that "additional authors, namely [Dr. Singh], could be added later."  [*Id.*]

As a result, four patents have been issued, two to Auburn (United States Patent No. 7,194,366 and United States Patent No. 7,409,306) and two to IBM (United States Patent No. 6,789,032 and U.S. Patent No. 7,139,944).  [*Id.* at ¶¶ 33, 37, 46, 47.]  Auburn's claims in this litigation are twofold: First, by using and continuing to use this technology, IBM is infringing Auburn's patent rights. Second (and what is at issue in this motion), Auburn claims that IBM should never have been afforded patent protection in the first place, since the inventions properly

belong to Dr. Singh, Mr. Barnett, and Auburn.   As a result, Auburn seeks a correction of inventorship and ownership on the two IBM patents, together with damages for IBM's conversion and unjust enrichment based on IBM's theft of Auburn's patent rights.

**B.     History of this Motion**

Auburn's original complaint included claims for (1) patent infringement; (2) unjust enrichment under Alabama law and (3) conversion under Alabama law.  On September 28, 2009, IBM filed a motion to dismiss the two state law claims [Doc. No. 31], claiming that Auburn's state law claims were preempted under federal law and claiming that Auburn's state law claims were barred by the applicable statutes of limitations.  Auburn opposed the motion [Doc. No. 39], IBM filed a reply [Doc. No. 43] and Judge Albritton allowed Auburn to file a surreply addressing new arguments made by IBM in its reply brief. [Doc. No. 45-2.]

In an order dated November 9, 2009 [Doc. No. 47], Judge Albritton found Auburn's complaint lacking in detail as to its state law claims for conversion and unjust enrichment.  As a result, the Court conditionally dismissed Auburn's two state law claims, but allowed Auburn to replead them:

> The allegations of the Complaint in this case assert claims for unjust enrichment and conversation which, as pled, are preempted under the legal analysis used by the Federal Circuit.  Because the briefs filed by Auburn in opposition to the Motion to Dismiss go beyond that which is alleged in the Complaint, however, the court will dismiss the state law claims without prejudice and allow Auburn an additional opportunity to seek to amend its Complaint to clarify the basis of the state law claims, should it choose to do so.

[*Id.* at 7.]

Consistent with the directive of the Court's November 9 order, Auburn filed a motion requesting leave to file an amended complaint on November 16, 2009. [Doc. No. 50.]  Together with that motion, Auburn filed a detailed amended complaint, in which Auburn laid out the history of the relationship between Dr. Singh, Mr. Barnett and Mr. Nigh, with specific citations

to the evidence supporting Auburn's allegations and its claims for conversion and unjust enrichment. [Doc. 50-2.]  In that complaint, Auburn also added two additional causes of action for correction of inventorship under 35 U.S.C. § 256 ("Section 256").

On November 23, 2009, IBM filed a brief [Doc. No. 60] opposing Auburn's motion for leave to file its amended complaint.  While IBM did not oppose Auburn's new claims for correction of inventorship, IBM continues to oppose Auburn's claims for unjust enrichment and conversion under Alabama law.  In its most recent brief, IBM has dramatically changed its theories, mischaracterized Auburn's previous briefs and misrepresented numerous critical facts. As a result, Auburn seeks leave to file this reply brief to clarify the record, and requests that the Court allow its amended complaint.

## III.   ARGUMENT

### A.   The State Law Claims In Auburn's Proposed Amended Complaint Are Not Preempted.

#### 1.   Auburn's Section 256 Claims Do Not Preclude Auburn's State Law Claims.

IBM's opposition to Auburn's amended complaint makes much of the rhetorical notion that, by now asserting Section 256 claims[2] to change the inventorship of the wrongly-issued IBM patents, Auburn has "conceded" that its state law unjust enrichment and conversion claims are preempted.  While Auburn has not "conceded" anything, on the law IBM is simply wrong.  The Federal Circuit has already resolved IBM's argument against it – Section 256 inventorship

---

[2] Auburn's original pleading of simply the state law claims to seek remedies for IBM's misconduct was entirely proper.  There is no requirement that the inventorship be corrected on the IBM patents for Auburn to secure its remedies for unjust enrichment and/or conversion. While, as an element of its unjust enrichment claim, Auburn does have to prove that its professors are the proper inventors of the inventions claimed in the IBM patents, there is no requirement that this litigation contain the Section 256 claim.  In light of the Court dismissing the original complaint on other grounds, however, rather than belabor this issue any further, Auburn has simply added the inventorship claims.

claims and state law claims for unjust enrichment and conversion may exist side-by-side in a complaint without the former preempting the latter. The *University of Colorado* case makes that clear.

In that case, American Cyanamid defrauded the University of Colorado in almost the precise fashion that IBM defrauded Auburn here. Professors at the University of Colorado provided to American Cyanamid confidential research papers on which American Cyanamid then filed a patent application without either: a) including the University professors as inventors on the patents; or b) the University's permission. *Univ. of Colo. Found., Inc. v. Am. Cyanamid*, 342 F.3d 1298, 1303 (Fed. Cir. 2003). Instead, as IBM did here, American Cyanamid simply filed the patent claims in an American Cyanamid employee's name and claimed ownership of the inventions in the patents. *Id.* Notably, the University of Colorado never filed patent applications on the information which was otherwise allowed to enter the public domain through papers published by the professors. *Id.* at 1307.

Based on this circumstance, the University of Colorado brought claims for correction of inventorship under 35 U.S.C. § 256, as well as conversion and unjust enrichment. [*See* Doc. No. 50-3 (*Univ. of Colo.* Second Amended Complaint) at ¶¶ 7, 53-57, 65, 79-80 and F.] After an initial finding in favor of the University that was then reversed, on remand, the district court determined that the University professors were the proper inventors of the patent-in-suit and that defendant's inventor was not a proper inventor. *Univ. of Colo. Found., Inc. v. Am. Cyanamid Co.*, 105 F. Supp. 2d 1164, 1176-83 (D. Colo. 2000). Based on this finding, the district court then found unjust enrichment liability. *Id.* at 1184-85. In addition to that liability, the district court ordered that the inventorship of the disputed patent be corrected under Section 256 to add plaintiffs' inventors and remove defendant's inventor. *Id.* at 1185-87.

The Federal Circuit affirmed. *Univ. of Colo. Found., Inc. v. Am. Cyanamid*, 342 F.3d. 1298, 1313 (Fed. Cir. 2003). In so doing, the Federal Circuit expressly found that the University's unjust enrichment claims were *not* preempted by federal law, and affirmed the lower court's decision on both the state law claims and the Section 256 claims. *Id.* at 1307-08.

The facts here are strikingly similar to those in the *University of Colorado* case. As alleged by Auburn, and as will be proven at trial, Auburn professor Dr. Singh provided confidential materials to IBM. [Doc. No. 50-2 at ¶¶ 23, 29, 32.] IBM then took those confidential materials and filed a patent application based on them without Auburn's permission and without naming Dr. Singh as the true inventor. [*Id.* at ¶¶ 33, 39-40.] IBM then obtained a patent from that filing, and a later patent that covers Dr. Singh's inventions, which were disclosed in confidence to IBM. [*Id.* at ¶¶ 33, 37.]

Accordingly, just as in the *University of Colorado* case, Auburn may seek state law remedies for IBM's malfeasance, in addition to the federal law remedy of curing the patent inventorship. Indeed, while arguing speciously that Auburn has "conceded" that its claims are barred, the opposite appears to be the case. By not challenging Auburn's inventorship claims, which the Federal Circuit has conclusively held may exist in tandem with the state law claims, IBM "concedes" that the state law claims may go forward, provided they are pled properly and are not time-barred, as is plainly the case. We turn now to IBM's arguments on these issues.

> **2.    Auburn's State Law Claims are Not Preempted for Any of the Other Reasons Raised By IBM.**

As conceded by IBM, Auburn's complaint alleges that Auburn made multiple confidential disclosures to IBM in connection with the parties' dispute. This was in response to the Court's criticism of Auburn's original pleading—that, while the chronology of events might support the claim for misuse of Auburn's confidential information, the complaint did not clearly

state it.  And while Auburn strongly disagrees that "confidentiality" is required to establish unjust enrichment—as distinct from information upon which someone could simply not file a patent—Auburn has now remedied that issue with a lengthy, detailed pleading supporting its state-law claims and the confidential nature of its disclosures to IBM.

Recognizing these allegations are fatal to its preemption claim, IBM in its opposition simply takes issue with them, raising a host of reasons why it thinks the allegations are untrue based on documents not included in Auburn's pleadings.  But, of course, the standard for considering whether a pleading would be futile requires the Court to take Auburn's allegations as stated.  *See, e.g.*, *Winer Family Trust v. Queen*, 503 F.3d 319, 330-31 (3d Cir. 2007) (determining the futility of a motion for leave to amend by "taking all pleaded allegations as true and viewing them in a light most favorable to the plaintiff.").  IBM cannot make futility arguments based on its disagreement with Auburn's pleadings.

Moreover, all of IBM's arguments hinge upon a deceptive sleight of hand—that the date of IBM's alleged malfeasance is the date IBM filed its so-called "utility" patent application in December, 2002.  But, as Auburn's complaint clearly alleges, and as IBM undoubtedly knows, the date that matters is one year before that on December, 26, *2001*.  [*See* Doc. No. 50-2 at ¶ 33.] That is the date of IBM's so-called "provisional" patent application, the first application in the chain of IBM's misconduct, which is when IBM took its first step towards pirating Auburn's inventions.

From this bit of trickery, IBM then goes on to raise a host of factual arguments about publications by Auburn and a one-page letter agreement between IBM and Auburn that, at best, are fanciful and, at worst, downright false.  For example, as best as Auburn can understand it, IBM seems to claim that the letter of understanding between IBM and Auburn of February,

2002, which was designed to help resolve the dispute, somehow inoculates IBM from any misconduct. Nonsense. That letter agreement was a good faith effort by Auburn to prompt discussions that would help resolve this dispute. No honest reading of that document would yield a result in which IBM was free to file patent applications on Auburn's information or in which the agreement would retroactively convert confidential information into non-confidential information.

As to the Singh publications IBM raises, this is simple back-filling. Nowhere does IBM point to any actual reliance on those publications out of the context of its relationship with Auburn or any conclusive proof that these publications somehow render a nullity the relationship of confidence and trust between IBM and Auburn. IBM's arguments do not establish that all of Auburn's confidential information was in the public domain or that IBM was free to copy the information. In reality, what those publications suggest is exactly what Auburn has pled: that its personnel are the true inventors of the IBM patents, and that IBM is liable to Auburn for unjust enrichment and conversion. [*See* Doc. No. 50-2 at ¶¶ 39-44.]

Moreover, none of the inventorship case law cited by IBM is applicable. All of the cases cited by IBM in its original memorandum were cases where preemption was found because the plaintiff was alleging only co-inventorship. [Doc. No. 31 at 7-8.] IBM acknowledges that Auburn has not pled co-inventorship but rather explicitly pled that Auburn's inventors should be substituted for IBM's inventors on at least IBM's '032 patent. Moreover, Auburn has pled that its personnel are the sole inventors of at least one claim in the '944 patent. [Doc. No. 50-2 at ¶¶ 39, 59.] IBM may not misappropriate Auburn's inventions, put them in an IBM patent and then add its own inventors without consequence. Therefore, IBM's co-inventorship cases are inapposite and Auburn's state law claims are not preempted.

Finally, based upon its investigation to date, Auburn believes and has alleged that its inventors (Dr. Singh and Mr. Barnett) are the sole inventors on IBM's '032 patent and has asked that its inventors be substituted for the improperly named IBM inventors.  In addition, Auburn believes and has alleged that, at a minimum, Dr. Singh should be added as an inventor to the '944 patent and that Auburn's inventors are the sole inventors on at least one claim of the '944 patent.  At most, IBM's named inventors are co-inventors who made minor modifications over the wrongfully obtained '032 patent, and Auburn is thus entitled to an assignment and ownership of the '944 patent based on the holding in *Richardson v. Suzuki*, 868 F.2d 1226, 1249 (Fed. Cir. 1989).  There, the court noted that correction of inventorship (an administrative task) and the remedy of assignment were different issues with respect to the wrongfully obtained patent.  *Id.* at 1249.  The court explained that the inventive contribution of defendant's employees to some of the claims in the patent did not negate the imposition of the equitable remedy and that "[t]o hold otherwise would ratify and indeed reward the wrongdoing."  *Id.*  The same reasoning applies here.  IBM should not be rewarded for its improper conduct by keeping ownership of the '944 patent.

In sum, Auburn has provided a detailed pleading setting forth state law claims that easily pass IBM's futility challenge.  IBM may want to argue the substance of the pleading, but at this stage of the proceeding the Court must view all of the allegations as true and view the allegations in the light most favorable to Auburn.  *See, e.g.*, *Winer Family Trust v. Queen*, 503 F.3d at 330-31.  The Court should allow Auburn to filed the amended state law claims.

**B.    Auburn's Unjust Enrichment Claims Are Not Barred By The Statute Of Limitations.**

    **1.    Auburn Is Part Of The State And Is Not Subject To A Statute Of Limitations Defense Under The Doctrine Of *Nullum Tempus Occurrit Reipublicae.***

There is a long-recognized doctrine in Alabama—*nullum tempus occurrit reipublicae* ("no time runs against the state")—that provides the state with immunity from defenses such as estoppel, waiver or statutes of limitations.  *See Raley v. Main*, 987 So. 2d 569, 584 (Ala. 2007) (The Alabama Supreme Court "frequently has noted, the concepts of estoppel and waiver . . . do not operate against the State.").  "The theory that no time runs against the state or commonwealth is generally followed in regard to ordinary statutes of limitation unless the state or commonwealth is expressly or by necessary implication included within the operation of the statute."  *State v. Estate of Crocker*, 83 So. 2d 261, 262 (Ala. App. 1955).  "The underlying rationale of this rule is that property owned by the government is held in trust for the people and that the intentional or negligent acts of the agents of the government should not serve to deny the people of the benefits and enjoyment of 'their' property."  *West Dauphin Ltd. P'ship v. Callon Offshore Prod., Inc.*, 725 So. 2d 944, 954 (Ala. 1998).   The doctrine recognized by the Alabama Supreme Court as early as 1863 in *Miller v. State*, 38 Ala. 600, remains alive and well.  *See Bd. of School Comm'rs of Mobile County v. Architects Group, Inc.*, 752 So. 2d 489, 492 (Ala. 1999) (recognizing the continuing vitality of the *nullum tempus* doctrine).  While IBM describes this doctrine as "archaic" and in need of "dust[ing] off" [Doc. No. 60 at 16], IBM cites no case since *Board of School Com'rs of Mobile County* was decided in 1999 which even suggests that this doctrine, recognized for at least 146 years by the Alabama Supreme Court, has been vitiated.

IBM then argues, without citing any opinions regarding universities, that Auburn is not part of the State and therefore cannot benefit from the doctrine.  IBM charges that "Auburn fails

to cite a single Alabama case where the doctrine of *nullum tempus* was actually applied to exempt the State of Alabama, an Alabama state university, or any other entity affiliated in any way with the State of Alabama, from an applicable statute of limitations."  [Doc. No. 60 at 17.]

In fact, Auburn previously directed the Court to *Cox v. Bd. of Tr. of the Univ. of Ala.*, 49 So. 814 (Ala. 1909) [Doc. No. 45-2 at 6-7], in which the Alabama Supreme Court **did analyze** the doctrine of *nullum tempus*[3] by looking to whether the University of Alabama is "part of the state," and indeed, the doctrine was **actually applied** to exempt the University of Alabama from an otherwise applicable statute of limitations.  Specifically, after analyzing the origins of the University of Alabama, the court in *Cox* not only concluded that "whatever corporate name or under the control of whatever agents it may be, [the University of Alabama] is a part of the state," but went as far as to state that it "seems impossible to escape the conclusion that the University of Alabama is a part of the state…." *Id*. at 817-18.  Based on this finding, the Alabama Supreme Court held that the University of Alabama was **exempt** from a 10-year statute of limitations for an action of ejectment applicable to other parties, but rather that for the university the applicable statute was the 20-year period that the legislature had expressly provided for actions by the state. *Id*. at 818-20.  The University of Alabama, like the state itself, was only  bound by the 20 year statute of limitations in that case because the legislature had specifically enacted a separate statute of limitations for actions by the state.  Here, IBM has not argued, nor could it, that either the State of Alabama or Auburn "is expressly or by necessary implication included within the operation" of the statute of limitations it seeks to apply.  *State v. Estate of Crocker*, 83 So. 2d at 262.

---

[3] The Supreme Court in *Cox* discusses and applies the *nullum tempus* doctrine without specific reference to its name.  49 So. 818, 820

Indeed, contrary to IBM's positions, Alabama universities routinely reap privileges reserved for the State under Alabama law, such as the related doctrine of sovereign immunity.[4] *See, e.g., Willis v. Univ. of N. Ala.*, 826 So. 2d 118, 120 (Ala. 2001) ("Although … UNA is a corporation, … we conclude that UNA is not subject to § 235, because UNA is a part of the State and § 235 does not apply to the State.  …); *Rigby v. Auburn Univ.*, 448 So. 2d 345, 347 (Ala. 1984) ("[W]e conclude that … Auburn University is an instrumentality of the state and therefore immune to suit by the terms of Section 14 of our state constitution."); *Hutchinson v. Bd. Of Tr. of Univ. of Ala.*, 256 So. 2d 281, 288 (Ala. 1971) (affirming the opinion of the Court of Civil Appeals concerning the applicability of the doctrine of governmental immunity to the Board of Trustees of University of Alabama).  In addition, the University of Alabama has benefited from immunity under the Eleventh Amendment. *Ming Wei Liu v. Board of Trustees of Univ. of Ala.*, 330 Fed. Appx. 775, 777 (11th Cir. 2009) (noting the unappealed district court finding that the University of Alabama, "as an instrumentality of the state of Alabama, is immune from suit under the Eleventh Amendment"); *see also Pennington Seed, Inc. v. Produce Exchange No. 299*, 457 F.3d 1334, 1339-41 (Fed. Cir. 2006) (finding that Eleventh Amendment immunity applied to bar patent infringement action against the University of Arkansas and its officials); *Tegic Comm'ns Corp. v. Bd. of Regents of the Univ. of Tex. Sys.*, 458 F.3d 1335, 1342-45 (Fed. Cir. 2006) (finding that the Board of Regents of the University of Texas System was protected from declaratory judgment suit under Eleventh Amendment immunity even where it had asserted patent against other parties in another jurisdiction).  IBM has provided no reason why the *nullum*

---

[4] *See, e.g., Bd. of School Comm'rs of Mobile County*, 752 So. 2d at 493, n.5 ("Although distinct from the doctrine of sovereign immunity, the doctrine of *nullum tempus occurrit reipublicae* is, nevertheless, related to it.")

*tempus* doctrine would apply with any less force to Auburn than the sovereign immunity that is reserved for the State.

IBM's final attempt to sidestep the doctrine of *nullum tempus* rests on the assertion that the doctrine is unavailable to Auburn because it is asserting "a private, proprietary right, not a public or governmental right." [Doc. No. 60 at 19.] This argument also fails, because Auburn is "part of the State," and thus the rights being asserted through Auburn's state law claims are "public rights." Flying in the face of this logic, IBM argues that, because Auburn's state law claims involve "inventions" or "intellectual property," Auburn is "not seeking to enforce a public or governmental right, the kind of right that could be asserted only by the State of Alabama." [*Id.* at 20.] IBM provides no statute, case law or other support for this argument, and a reading of the primary case IBM does cite, *La Republique Francaise v. Saratoga Vichy Spring Co.*, 191 U.S. 427 (1903), makes clear that the proper consideration is the real party in interest. *La Republique Francaise* involved a dispute over the commercial use of the word "Vichy" by a Saratoga, NY bottling company. *Id.* at 428. The plaintiffs were the French Republic, which owned water springs in Vichy, France, and a company to which the government had leased the springs for many decades. *Id.* at 434-35. The court questioned (but did not answer) whether *nullum tempus* could apply to foreign sovereigns, and held that the doctrine was inapplicable because the French Republic, while "nominally the plaintiff, its interest in the litigation is little, if anything, more than nominal." *Id.* The court explained that in circumstances where the sovereign was suing for the benefit of a private party or a proprietary right of a private party the doctrine does not apply:

> To hold that the French Republic appears in this litigation to suing for the use and benefit of the Vichy company would more accurately describe their relations.

> In such cases either where the government is suing for the use and benefit of an individual, or for the prosecution of a private and proprietary, instead of a public or governmental right, it is clear that it is not entitled to the exemption of *nullum tempus*, and that the ordinary rule of laches applies in full force.

*Id.* at 438; *see also, U.S. v. Beebe*, 8 S.Ct. 1083, 1086 (1888) ("The question is, are these defenses available to the defendant in a case where the government, although a nominal complainant party, has no real interest in the litigation, but has allowed its name to be used therein for the sole benefit of a private person?"); *U.S. v. Des Moines Nav. & R. Co.*, 142 U.S. 510, 538-39 (1892) ("[Y]et it has also been decided that, where the United States is only a formal party, and the suit is brought in its name to enforce the rights of individuals, and no interest of the government is involved, the defense of laches and limitation will be sustained as though the government was out of the case, and the litigation was carried on in name, as in fact, for the benefit of private parties.") (citation omitted).[5]

Here Auburn has brought suit in its own name to protect the intellectual property developed at the university using the resources of the State of Alabama.  Auburn is not a "nominal party" and is not suing for the benefit of a private entity.

> **2.      IBM's Arguments Concerning The Doctrine Of *Nullum Tempus* Are Moot Because Auburn's Unjust Enrichment Claim Is Based on Breach of an Implied Contract and Was Filed Within the Applicable Six-Year Statute of Limitations.**

IBM's primary basis for arguing that Auburn's unjust enrichment claim is governed by a two-year statute of limitations is that "Auburn … still has not cited any Alabama authority applying the six-year statute of limitations for 'simple contracts' to an unjust enrichment claim." [Doc. No. 60 at 14.]  What IBM neglects to admit is that ***no Alabama court has analyzed***

---

[5] IBM's reliance on *Montgomery Co. v. City of Montgomery*, 70 So. 642 (Ala. 1916), in which none of the parties were "part of the State," is also misplaced.  [Doc. No. 60 at 20, n.14.]

whether the two or six-year statute of limitations applies to unjust enrichment claims.   This includes the only two cases cited by IBM.

In *Birmingham Hockey Club, Inc. v. Nat'l Council on Compensation Ins., Inc.*, 827 So. 2d 73 (Ala. 2002), the Alabama Supreme Court affirmed dismissal of an unjust enrichment claim under the statute of limitations, without addressing what time period applied, because the plaintiff had not raised the issue with the lower court.[6]   Such non-litigated issues are ***not*** precedential holdings binding future decisions. *See U.S. v. L.A. Tucker Truck Lines*, 344 U.S. 33, 37-38 (1952); *Webster v. Fall*, 266 U.S. 507, 511 (1925).

Likewise, the court did not analyze the issue in *Johnston-Tombigbee Furniture Mfg. Co. v. Berry*, 937 So.2d 1047 (Ala. Civ. App. 2006).   Ultimately, the court held that plaintiff's claims accrued in 1989, more than ten years prior to the date the suit was filed.  *Id.* at 1052.   As such, the court never had reason to consider whether a two or six-year statute of limitations period applied to claims for unjust enrichment.   Indeed, with respect to plaintiff's assertion that its conversion claim was subject to a six-year statute of limitations, the court stated that it "need not address this issue, because, as discussed later in this opinion, that claim would still be barred as untimely because it accrued in 1989."  *Id.* at 1049, n.2.

Thus, the present two versus six-year statute of limitations issue is essentially a matter of first impression for this Court, and the cited authority overwhelmingly supports Auburn's position that its unjust enrichment claim is governed by a six-year statute of limitations. Auburn's claim of unjust enrichment stems from an implied contract, which as Auburn has

---

[6]   In an appeal brief to the Supreme Court of Alabama, the plaintiff in *Birmingham* set forth argument and authority for its contention that its unjust enrichment claim was subject to a six-year, and not two-year, state of limitations under Alabama law.   However, because this issue was deemed waived, the Supreme Court of Alabama did not consider these arguments and authority.  *Id.* at 81.

previously set forth [Doc. No. 39 at 9-10], is properly subject to a longer six-year statute of limitations.  *See* Ala. Code § 6-2-34.

In a reversal of its previous position, IBM, for the first time, argues that Auburn's state law claims are barred even by the six-year statute of limitations.  [Doc. No. 60 at 15-16.]  In its original moving papers, the only dates IBM referenced as to when Auburn's unjust enrichment claim "accrued" were the September 2004, and November 2006, issuance dates of the IBM patents, which are respectively less than five and three years before Auburn filed suit in July 2009.  [Doc. No. 31at 3-4.]  IBM has never before argued that a statute of limitations period should begin prior to the issuance of the IBM patents, and in fact, IBM has never before suggested that Auburn's conversion claim is time barred.  IBM's new-found argument fails because Auburn's state law claims are based on the improper ***issuance*** of the IBM patents, an event that occurred well within the applicable six-year statutory period.

### C.    Auburn Has Properly Pled A Claim For Conversion Under The Controlling Alabama Law.

Desperate to avoid the application of Alabama law, IBM continues to focus on the "last element" and "last event" associated with Auburn's conversion claim in arguing that Vermont law should apply.  [Doc. No. 60 at 21-22.]  However, as Auburn previously set forth [Doc. No. 39 at 12-14], Auburn's conversion claim seeks remedies not for personal injury or the like, but rather for financial injury, and in instances such as this, "the location where the financial injury was felt is determinative under *lex loci delicti.*"  *Chambers v. Cooney*, Case No. 1:07-cv-00373, 2007 WL 2493682, *11 (S.D. Ala. Aug. 29, 2007) (citation omitted); *see also Allison v. Vintage Sports Plaques*, 136 F.3d 1443, 446 n.6 (11th Cir. 1998) (applying law of Alabama, where plaintiff resided, in a right of publicity case).  Auburn is part of the State of Alabama.  As a result of IBM's misappropriation of Auburn's confidential information and the wrongful issuance of

18

the IBM patents, Auburn has been subjected to financial harm.  Such harm has been and continues to be felt in by Auburn in the State of Alabama, the laws of which therefore govern Auburn's conversion claim.  IBM does not cite any analysis by any court that dictates otherwise.

Moreover, while Auburn believes that it pled all necessary elements under Alabama law with its original conversion claim, Auburn nevertheless included additional, specific allegations in its proposed amended complaint to address IBM's prior objections.  Now, IBM makes the novel (but unsupported) argument that conversion could not have taken place because, even if wrongfully obtained, IBM has "title" to its patents.  [Doc. No. 60 at 23.]  If IBM's position were accepted, then conversion of patent rights could *never* be adequately pled.  Such is not the law.  *See SLT, L.L.C. v. Tri Khan Tran*, No. 1:07-cv-00815, 2009 WL 532169, at *10 (S.D. Ala. 2009) ("No party argues that a patent cannot be 'converted.'")

IBM's continued reliance on *SLT* highlights IBM's mistaken application of the law to the present facts.  In *SLT*, plaintiff's conversion claim was based on a bailment theory, with plaintiff alleging that the defendant was obligated by a prior agreement to assign a patent to plaintiff upon the occurrence of a certain event.  *Id.* at *11.  In contrast, Auburn's conversion claim is not based on an agreement by IBM to assign the IBM patents, but rather on IBM's wrongful taking of Auburn's intellectual property.[7]  *See Singer Asset v. Conn. Gen. Life Ins.*, 975 So.2d 375, 381-82 (Ala. Civ. App. 2007) ("To constitute conversion, there must be a wrongful taking or a wrongful detention or interference, or an illegal assumption of ownership, or an illegal use or misuse of

---

[7] As previously argued, correction of inventorship in the IBM patents alone does not make Auburn whole, nor does it eliminate Auburn's conversion claim.  *See Brown v. Campbell*, 536 So.2d 920, 921 (Ala. 1988) (holding that return of allegedly converted property before trial did not preclude the conversion action because "the tort of conversion is complete when the property is converted"); 90 C.J.S. Trover and Conversion, § 3 (2002) ("The essence of conversion is a wrongful deprivation of the owner's property, whether temporarily or permanently.")

another's property. . . . Conversion requires 'a wrongful exercise of dominion over property in exclusion or defiance of a plaintiff's rights, where said plaintiff has . . . the immediate right to possession.'") (citations omitted).

**D.     Under Rule 15(a), Leave To Amend Should Be Freely Granted.**

Motions for leave to amend a complaint should be "freely given when justice so requires," and "[l]eave to file an amendment should be granted liberally."  Fed. R. Civ. P. 15(a); *Cmty. State Bank v. Strong*, 485 F.3d 597, 612 (11th Cir. 2007); *Harris v. Garner*, 216 F.3d 970, 996 (11th Cir. 2000).  Although the decision whether to grant leave to amend the pleadings pursuant to Rule 15(a) is within the discretion of the trial court, *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1315 (11th Cir. 1999), Rule 15 contemplates that leave shall be granted unless a substantial reason exists to deny it.  *Harris*, 216 F.3d at 996 (citing *Espey v. Wainwright*, 734 F.2d 748 (11th Cir. 1984)).  No substantial reason exists to deny Auburn's motion to amend its complaint.

**IV.    CONCLUSION**

For all the foregoing reasons and those previously provided in Auburn's Motion for Leave to File an Amended Complaint and Auburn's Opposition and Surreply In Opposition to IBM's Motion to Dismiss, the Court should grant Auburn's request for leave to amend, and should allow Auburn's First Amended Complaint to be filed with the Court.

Respectfully submitted,

Dated:  December 7, 2009

*s/David R. Boyd*
David R. Boyd (BOYD0717)
dboyd@balch.com
G. Lane Knight (KN1028)
lknight@balch.com
BALCH & BINGHAM LLP
105 Tallapoosa St., Suite 200
P.O. Box 78
Montgomery, AL 36101-0078
Telephone:  (334) 834-6500
Facsimile:  (334) 269-3115

Juanita Brooks (CA 75934) brooks@fr.com
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130
Telephone:  (858) 678-5070
Facsimile:  (858) 678-5099

Jonathan E. Singer (MN 0283459) singer@fr.com
Michael J. Kane (MN 247625) kane@fr.com
John C. Adkisson (MN 266358) adkisson@fr.com
William R. Woodford (MN 322595)
woodford@fr.com
FISH & RICHARDSON P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN  55402
Telephone:  (612) 335-5070
Facsimile:  (612) 288-9696

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 7, 2009, I filed the foregoing with the Court's CM/ECF system, causing this filing to be served electronically on all parties registered with the Court's electronic filing system.

*s/David R. Boyd*
One of the Attorneys for Plaintiff Auburn University

21