UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| AUBURN UNIVERSITY,<br>an Alabama Corporation,<br><br>        Plaintiff,<br><br>    v.<br><br>INTERNATIONAL BUSINESS<br>MACHINES CORP., a New York<br>Corporation,<br><br>        Defendant. | Case No. 3:09-cv-00694 (MEF)<br><br>**REDACTED PUBLIC VERSION** |

**AUBURN UNIVERSITY'S OPPOSITION TO IBM'S MOTION TO BIFURCATE
FOR TRIAL AUBURN'S CORRECTION OF INVENTORSHIP CLAIMS REGARDING
THE IBM PATENTS FROM ITS INFRINGEMENT CLAIMS REGARDING THE
<u>AUBURN PATENTS</u>**

IBM's Motion to Bifurcate should be denied because the bifurcation proposed by IBM serves no legitimate purpose. Rather than simplifying or streamlining the presentation of evidence in this case, bifurcation will achieve the opposite result—artificially balkanizing what should be a single, coherent case into two highly redundant trials—trials with overlapping exhibits, overlapping witnesses, and overlapping (and potentially inconsistent) fact finding. Far from eliminating potential prejudice, bifurcation would be highly prejudicial to Auburn, interfering with its ability to provide the jury with a comprehensive explication of the relevant facts, and potentially infringing on its 7th Amendment jury right. For all of these reasons, IBM's motion should be denied.

I.     **FACTUAL BACKGROUND**

   A.     **Auburn's Claims Against IBM**

Although Auburn has filed both patent infringement and correction of inventorship claims, all of these claims involve a common nucleus of facts, because they all relate to IBM's intentional decision to misappropriate Auburn's intellectual property. The property in question, comprising patented inventions that provide novel and low-cost methods of estimating the reliability of integrated circuits, was developed at Auburn in 2000 and 2001 by Professor Adit Singh and his then-graduate student, Thomas Barnett. Professor Singh and Dr. Barnett subsequently filed for patents on Auburn's behalf, which led to the issuance of Auburn's '366 and '306 patents. (Auburn's First Amended Complaint (Doc. 87) at 2-3[1]; Auburn's 2nd Supp. Resp. to IBM Interrogs. 12 & 13[2] at 5-9 & Exs. A-B.)

   IBM's decision to misappropriate Auburn's technology manifested itself in two ways. First, IBM knowingly violated Auburn's intellectual property rights by using Auburn's inventions without permission. ████████████████████████████████

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

---

[1] Copy attached as Exhibit A.
[2] Copy attached as Exhibit B.
[3] Copy of pages from deposition transcript of Phillip J. Nigh attached as Exhibit C.
[4] Copy of Exhibit 34 from the deposition of Phillip J. Nigh attached as Exhibit D.
[5] Copy of pages from deposition transcript of Thomas S. Barnett Jr. attached as Exhibit E.

██████████████████████████████████████████████████████████

████████████████████████████████████████████ (Auburn's

Resp. to IBM Interrogs. 1-11[6] at 13-14 (responding to Interrog. 8); Ex. C at 48:9-20.)

The second aspect of IBM's misappropriation of Auburn's intellectual property took the form of fraudulent patent filings. Apparently recognizing the great value of Auburn's inventions, but not satisfied merely to practice those inventions without authorization, IBM took the added step of filing its own patent applications, directed to the same subject matter as Auburn's patents, but omitting any mention of Auburn's role in the invention. (Ex. A at 3; Ex. B at 6-7, Exs. A-B.) IBM attempted to support its claim of ownership by failing to identify Professor Singh as an inventor on either of the patent applications that it had filed, and by instead naming only IBM employees involved in IBM's efforts to commercialize the inventions, including Dr. Barnett. (*Id.*) IBM took this action even though Dr. Barnett was well aware that the ideas being claimed had been developed prior to his time at IBM, and even though ██████

██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████[7]
██████████████████████████████████████████████████████████
████████████████████████████████████████

  ██████████████████████████████████████████████
  ██████████████████████████████[8]
    ████████████████████████████████████████████[9]
      ██████████████████████████[10]

---

[6] Copy attached as Exhibit F.
[7] Copy of pages from deposition transcript of Matthew Grady attached as Exhibit G.
[8] Copy attached as Exhibit H.
[9] Copy attached as Exhibit I.
[10] Copy of Exhibit 37 from the deposition of Phillip J. Nigh attached as Exhibit J.

3



Ex. G at 183:21-184:20, 190:13-25 (emphasis added).

**B.     IBM's Defenses**

In response to Auburn's claims of patent infringement, IBM has raised, on various factual theories, the affirmative defense that Auburn's patents are invalid. Two of these theories, in particular, are closely related to, and in effect turn on, the resolution of Auburn's inventorship claims discussed above.

First, IBM has alleged that the Auburn patents are invalid because, according to IBM, (a) it was actually IBM employees who first invented what is claimed in the Auburn patents, and (b) Professor Singh and Dr. Barnett learned of these inventions during Dr. Barnett's summer internship at IBM. (IBM Supp. Resp. to Auburn 1st and 6th Interrogs. 2 and 22[11] at 58-76, 83-86.) Thus IBM has alleged, as a basis for its invalidity defense, a factual scenario that is 180 degrees opposed to Auburn's claim that Professor Singh is an inventor of the IBM patents. In effect, the parties have asserted competing claims to have invented the overlapping subject matter of the Auburn and IBM patents. Untangling those claims will involve resolving the highly factual questions of who invented what, when it was invented, and what information was communicated between Auburn and IBM prior to their respective patent filings.

---

[11] Copy attached as Exhibit K.

In addition to disputing the inventorship of the Auburn patents, IBM has also alleged that the provisional patent application from which IBM's '032 patent claims priority, application No. 60/344,209)[12] (the "'209 application") actually anticipates, and thus invalidates, both of the Auburn patents in suit. (*Id.* at 66, 84.) Here too, there is substantial factual overlap between IBM's invalidity defense and Auburn's inventorship allegations. IBM's '209 application was filed on December 26, 2001, a number of months after Thomas Barnett's 2001 summer internship. However, IBM's '209 application can only be prior art to the Auburn patents if it was filed *prior to* the invention of the claimed inventions at Auburn. *See* 35 U.S.C. § 102(e) (2011); *In re Giacomini*, 612 F.3d 1380, 1383 (Fed. Cir. 2010) ("[A]n applicant is not entitled to a patent if another's patent discloses the same invention, which was carried forward from an earlier U.S. provisional application or U.S. non-provisional application."). Accordingly, Auburn's inventorship claims—that the IBM patents purport to claim techniques that were actually invented at Auburn prior to Dr. Barnett's summer internship—cannot factually co-exist with IBM's assertion that the '209 application is prior art.

## II.     RELEVANT LEGAL PRINCIPLES

Fed. R. Civ. P. 42(b) authorizes a court to bifurcate trial, "for convenience, to avoid prejudice, or to expedite and economize." Fed. R. Civ. P. 42(b). "Whether to bifurcate a trial is a matter to be decided on a case-by-case basis, and must be subject to an informed discretion by the trial judge in each instance." *Brown v. Toscano*, 630 F. Supp. 2d 1342, 1345 (S.D. Fla. 2008). However, "the [p]resumption is that the plaintiff, in a typical case, should be allowed to present [its] case in the order [it] chooses. The burden is on the defendant to convince the court that a separate trial is proper in light of the general principle that a single trial tends to lessen the

---

[12] Copy attached as Exhibit L.

delay, expense and inconvenience to all parties." *Sensitron, Inc. v. Wallace*, 504 F. Supp. 2d 1180, 1186 (D. Utah 2007). *See also Lowe v. Phila. Newspapers, Inc.*, 594 F. Supp. 123, 125 (E.D. Pa. 1984). "The party seeking bifurcation has the burden of demonstrating that judicial economy would be served and that no party would be prejudiced by separate trials." *Novopharm Ltd. v. Torpharm, Inc.*, 181 F.R.D. 308, 310 (E.D.N.C. 1998). For this reason, "[b]ifurcation in patent cases, as in others, ***is the exception***, not the rule." *Brown*, 630 F. Supp. 2d at 1346 (emphasis added).

In determining whether to bifurcate, the court should "be mindful of the traditional role of the factfinder; *i.e.*, to make an ultimate determination on the basis of a case ***presented in its entirety***." *Kimberly-Clark Corp. v. James River Corp. of Va.*, 131 F.R.D. 607, 608 (N.D. Ga. 1989) (emphasis added). Accordingly, "courts should not order separate trials ***unless such a disposition is clearly necessary***." *Laitram Corp. v. Hewlett-Packard Co.*, 791 F. Supp. 113, 114 (E.D. La. 1992) (emphasis added). *See also Real v. Bunn-O-Matic Corp.*, 195 F.R.D. 618, 620 (N.D. Ill. 2000).

A claim for correction of inventorship is an equitable claim that, ***standing alone***, would ordinarily be tried to the court. *See Shum v. Intel Corp.*, 499 F.3d 1272, 1277 (Fed. Cir. 2007). However, when an inventorship claim (or any other equitable claim) shares common factual issues with legal claims in the same action—such as claims for patent infringement—to which a jury trial right attaches, ***it is the jury, not the court, that must resolve those factual issues***. *See Shum*, 499 F.3d at 1279 ("While Shum would not be entitled to a jury trial on the § 256 inventorship claim standing alone, given the co-pendency of the asserted fraud claim, a jury should determine the facts regarding inventorship."); *St. Jude Med., Inc. v. Access Closure, Inc.*, No. 08-CV-4101, 2010 WL 4880806, at *2 (W.D. Ark. Nov. 23, 2010) ("[G]iven the co-

6

pendency of the invalidity defense, a jury should determine the facts regarding inventorship."). The reason for this rule is twofold. Having the Court decide common factual issues in advance of the jury trial would violate the *7th Amendment guarantee* of a jury trial in patent cases. *Shum*, 499 F.3d at 1279. Conversely, having the Court decide those issues after a jury trial in a way that was inconsistent with the jury's verdict would violate principles of *res judicata.* See *Cabinet Vision v. Cabnetware*, 129 F.3d 595, 599-601 (Fed. Cir. 1997). For these reasons, it is common for inventorship claims to be tried to juries in the context of patent infringement actions. See *St. Jude Med.*, 2010 WL 4880806, at *2 n.3 (noting "scores of cases" in which juries have determined the factual issues relating to inventorship claims).

### III.  ARGUMENT

#### A.  The Substantial Overlap Between Auburn's Inventorship and Infringement Claims Makes Bifurcation Inappropriate

IBM's Motion to Bifurcate is premised on the assumption that Auburn's equitable inventorship claims "stand totally alone" from Auburn's legal patent infringement claims (IBM Br. at 4), and thus may be tried to the Court in a proceeding that is entirely separate and distinct from the jury trial. But this is a false assumption. Because Auburn's inventorship claims are, in fact, premised on factual allegations that are also highly material to Auburn's infringement claims and IBM's invalidity defenses, those facts should be decided by the jury, and not by the Court. See *Shum*, 499 F.3d at 1279; *St. Jude Med.*, 2010 WL 4880806, at *2. Moreover, because virtually all of the evidence that would be relevant to Auburn's inventorship claim is also relevant to Auburn's infringement allegations and IBM's invalidity defenses, a second trial on inventorship would result in a substantial duplication of effort with the first trial, thereby improperly *increasing* the delay, expense and inconvenience to the parties and witnesses. See

7

*Sensitron*, 504 F. Supp. 2d at 1186 (noting that "a single trial tends to lessen the delay, expense and inconvenience to all parties").  For both of these reasons, IBM's motion should be denied.

> **1.   The Inventorship Claims Should be Tried to the Jury Because There is a Commonality of Factual Issues Between Auburn's Inventorship and Infringement Claims**

As noted above, ***a trial court lacks discretion to bifurcate*** equitable inventorship claims from a patent infringement trial where "commonality exists between the factual issues underlying the inventorship and [infringement] claims."  *Shum*, 499 F.3d at 1279.  In the present case the commonality of factual issues is substantial.  Indeed, as is shown below, most of the factual issues that must be decided to adjudicate Auburn's inventorship claims are also material to Auburn's infringement case, as well as to IBM's affirmative defenses of patent invalidity.

In order to prove that the Auburn inventors—Professor Singh and Dr. Barnett—are the sole legitimate inventors of any claims of the IBM patents, Auburn will need to prove: (a) that Singh and Barnett conceived of those claims; (b) that they did so without the involvement of IBM's named inventors; (c) that they communicated that conception to IBM prior to any conception of the inventions by IBM; and (d) that IBM filed its patent applications based on what was communicated.  *Trovan, Ltd. v. Skymat SA*, 299 F.3d 1292, 1301-03 (Fed. Cir. 2002) ("conception is the touchstone of inventorship"); *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1576 (Fed. Cir. 1997) (reviewing derivation as a question of fact and stating "[t]o show derivation, the party asserting invalidity must prove both prior conception of the invention by another and communication of that conception to the patentee"); *Sewall v. Walters*, 21 F.3d 411, 415 n.3 (Fed. Cir. 1994) ("[T]he existence of research or experimentation does not necessarily indicate, by itself, that complete conception did not exist. One must look for a nexus between the research or experimentation and the subject for which patent protection is sought.").

Consistent with these requirements, Auburn intends to prove the following at trial:

- Singh and Barnett conceived of Statistical Reliability Methods that are the subject of both the Auburn and IBM patents no later than May of 2001, and prior to Barnett's summer internship at IBM;

- Singh and Barnett communicated their Statistical Reliability Methods to IBM, and in particular to the remaining inventors named by IBM, prior to and during Dr. Barnett's 2001 summer internship;

- IBM had not independently developed the Statistical Reliability Methods prior to learning of Auburn's inventions;

- ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████

- IBM filed patent applications based on the Statistical Reliability Methods after learning about them from the Auburn inventors and told the United States Patent and Trademark Office that such methods were entitled to patent protection; and

- ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████

As the following chart shows, each of these factual elements of Auburn's inventorship case is also material to issues in the infringement case that the jury must decide:

| Factual Issue | Relevance |
|---|---|
| Singh and Barnett conceived of Statistical Reliability Methods that are the subject of both the Auburn and IBM patents no later than May of 2001. | <ul><li>Negates IBM's contention that the Auburn patent claims are invalid because Singh and Barnett did not invent them.[13]</li><li>Negates IBM contention that the '209 application, with a December 24, 2001 filing date, is prior art to the Auburn patents.[14]</li></ul> |
| Singh and Barnett communicated their Statistical Reliability Methods to IBM, and in particular to the remaining IBM-named inventors, prior to and during Dr. Barnett's 2001 summer internship. | <ul><li>Negates IBM contention that the '209 application, with a December 24, 2001 filing date, is prior art to the Auburn patents.[15]</li></ul> |
| IBM had not independently developed the Statistical Reliability Methods prior to Dr. Barnett's 2001 summer internship. | <ul><li>Provides objective evidence that the Statistical Reliability Methods were non-obvious at the time of the invention, and thus negates IBM's assertion that Auburn's inventions are obvious over the prior art.[16]</li></ul> |
| ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████ | <ul><li>█████████████████████████████ █████████████████████████████ ██████████████[17]</li><li>Provides objective evidence that the Statistical Reliability Methods were non-obvious at the time of the invention, and thus negates IBM's assertion that</li></ul> |

---

[13] *See* 35 U.S.C. § 102(f) (2011); *Creative Compounds, LLC v. Starmark Labs.*, __ F.3d __, 2011 WL 2519513, at *7 (Fed. Cir. 2011); *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1576 (Fed. Cir. 1997).

[14] *See* 35 U.S.C. § 102(e) (2011); *In re Giacomini*, 612 F.3d 1380, 1383 (Fed. Cir. 2010).

[15] *See id.*

[16] Whether an invention is non-obvious can require more than just analyzing the differences between the prior art and the claimed invention. The Supreme Court has instructed that courts should also consider "secondary considerations" of non-obviousness, which are objective factors that may show that an invention was not obvious from the prior art. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966) ("Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy."). *See also Heidelberger Druckmaschinen AG v. Hantscho Commercial Prods., Inc.*, 21 F.3d 1068, 1072 (Fed. Cir. 1994) ("Litigation argument that an innovation is really quite ordinary carries diminished weight when offered by those who had tried and failed to solve the same problem, and then promptly adopted the solution that they are now denigrating.").

[17] *See Georgia-Pacific Corp. v. Us. Plywood Corp.*, 318 F. Supp. 1116, 1119-20 (S.D.N.Y. 1970) (listing factors relevant to establishing a reasonable royalty, including "advantages of the patent property over the old modes" (factor nine), "the benefits to those who have used the invention" (factor ten), and "[t]he extent to which the infringer has made use of the invention" (factor eleven)); *i4i Ltd. v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010) ("We have consistently upheld experts' use of a hypothetical negotiation and *Georgia-Pacific* factors for estimating a reasonable royalty.").

| | |
|---|---|
| | - Auburn's inventions are obvious over the prior art.[18]<br>- Demonstrates IBM's awareness that the Statistical Reliability Methods originated with Auburn, and not with IBM, and therefore supports Auburn's contention that IBM's infringement of the Auburn patents was willful.[19] |
| IBM filed patent applications based on the Statistical Reliability Methods after learning about them from the Auburn inventors, and told the Patent Office that such methods were entitled to patent protection. | - Demonstrates the value of the Statistical Reliability Methods to IBM and is probative of the appropriate reasonable royalty for IBM's infringement.[20]<br>- Provides objective evidence that the Statistical Reliability Methods were non-obvious at the time of the invention, and thus negates IBM's assertion that Auburn's inventions are obvious over the prior art.[21]<br>- Demonstrates that IBM was prepared to recklessly disregard Auburn's rights in the patented inventions, and is probative of Auburn's claim of willful infringement.[22] |
| ███████████████████████<br>███████████████████████<br>███████████████████████<br>███████████████████████<br>█████████████ | - Demonstrates that IBM was prepared to recklessly disregard Auburn's rights in the patented inventions, and is probative of Auburn's claim of willful infringement.[23] |

---

[18] *See supra* note 4; *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 991(Fed. Cir. 1988) (finding accused infringer's copying of the "claimed invention, rather than one in the public domain, is indicative of nonobviousness").

[19] *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 449 F.3d 1209, 1225-26 (Fed. Cir. 2006) (finding substantial evidence supported a jury verdict of willful infringement where evidence that accused infringer hired the patentee's former employee who knew the patentee's product permitted an inference of copying).

[20] *See Georgia-Pacific Corp.*, 318 F. Supp. at 1120 (factors four, ten, eleven, and thirteen).

[21] *See supra* note 4; *Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1352 (Fed. Cir. 2010) (finding secondary considerations supported jury's finding of nonobviousness where accused infringer touted features of its product that specifically related to the patented invention); *Windsurfing Int'l Inc. v. AMF Inc.*, 782 F.2d 995, 1000 (Fed. Cir. 1986) ("The district court properly noted that copying the claimed invention, rather than one within the public domain, is indicative of obviousness.").

[22] *See In re Seagate Tech., LLC*, 497 F.3d 1360, 1370–71 (Fed. Cir. 2007); *cf. Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060 (2011) (indirect infringer liable for knowingly causing infringements where it was willfully blind to the probability that it was causing infringements).

[23] *See id.*

11

### 2. There is Substantial Overlap in Evidence Likely to be Presented in Both the Inventorship and Infringement Cases

Even if this Court were to conclude that there was an insufficient commonality of factual issues to *require* that Auburn's inventorship claims be tried to the jury, the Court should, nonetheless, exercise its discretion by declining to order bifurcation in this case. As noted above, there is a strong presumption in favor of permitting the plaintiff to present its entire case to the factfinder, in the order in which it chooses. *Sensitron*, 504 F. Supp. 2d at 1186; *Novopharm*, 181 F.R.D. at 310. Absent a showing that bifurcation is necessary to promote judicial economy, bifurcation should not be ordered. *Novopharm*, 181 F.R.D. at 310; *Brown*, 630 F. Supp. 2d at 1346; *Edge Capture L.L.C. v. Lehman Bros. Holdings, Inc.*, No. 08 C 2412, 2008 WL 4083146, at *2-3 (N.D. Ill. Aug. 28, 2008) (denying motion to bifurcate where movant failed to show it would promote judicial economy).

Here, IBM has utterly failed to show that bifurcation will promote judicial economy. Although IBM argues that "bifurcation will narrow the jury trial to only the factual issues that the jury need consider" (IBM Br. at 5), it cannot show that there would be a substantial quantum of evidence that could be excluded from the jury trial as a result of bifurcation. To the contrary, there will likely be a substantial overlap of not only issues for the fact finders to decide, but also of witnesses (*e.g.*, Auburn's named inventors, IBM's named inventors, and the parties' technical experts), and as well as documents (*e.g.*, Auburn's invention documents, communications between Auburn and IBM, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ )

Whether or not the case is bifurcated, the triers of fact regarding **both** infringement and inventorship will need to consider:

- Factual testimony and documentary evidence concerning the Auburn inventors' development of their Statistical Reliability Methods;

- Technical expert testimony explaining the Statistical Reliability Methods;

- Factual testimony and documentary evidence concerning IBM's failure to develop the Statistical Reliability Methods independently of Auburn;

- Factual testimony and documentary evidence concerning communications between IBM and the Auburn inventors concerning Statistical Reliability Methods prior to the filing dates of the Auburn and IBM patents;

- ███████████████████████████████████████████████████████████████████████████ and

- Factual testimony and documentary efforts concerning IBM's efforts to patent the Statistical Reliability Methods.

Requiring the parties to provide duplicative testimony, and to enter duplicative documents into evidence, is the antithesis of judicial economy, and would be prejudicial to Auburn by requiring it to duplicate its efforts. This reason alone is sufficient to deny IBM's motion. *See DSM Desotech, Inc. v. 3D Systems Corp.*, 2008 WL 4812440, *7 (N.D. Ill. 2008) ("Because bifurcating this trial would prejudice Desotech by requiring it to duplicate its efforts and because 3DS has failed to show that such prejudice would be outweighed by other considerations, the court concludes that bifurcation is inappropriate in this case."); *Medtronic Xomed, Inc. v. Gyrus ENT LLC*, 440 F. Supp. 2d 1333, 1336 (M.D. Fla. 2006) (where evidence relating to equitable

claim is "the same or entwined with evidence relevant to" legal claims, "a separate bench trial of [the equitable claim] . . . would not be the most efficient use of judicial resources, and could require re-calling witnesses who will or had testified at the jury trial."); *Transclean Corp. v. Bridgewood Servs.*, 101 F. Supp. 2d 788, 791 (D. Minn. 2000) ("[W]e think it to be an inadvisable use of judicial resources to segregate certain factual issues, which may require the recalling of witnesses, for a separate evidentiary Hearing to the Court."); *3M Innovative Props. Co. v. Dupont Dow Elastomers LLC*, 361 F. Supp. 2d 958, 981 (D. Minn. 2005) ("If the Court bifurcated . . . it appears that evidence would have to be introduced again, and witnesses would testify twice . . . . Rather than engage in a duplication of resources, the Court denies the Motion to Bifurcate."); *AEA Technology PLC v. Thomas & Betts Corp.*, No. 99 C 8157, 2002 WL 172443, at *4 (N.D. Ill. Feb. 4, 2002) (denying motion to bifurcate where second trial "could well involve claim construction and the presentation of experts who will also be needed at the infringement portion of the trial"); *Precision Shooting Equip., Inc. v. Golden Eagle Indus. LLC*, No. 8:00-450CIV-T17TGW, 2005 WL 1669120, *2 (M.D. Fla. July 8, 2005) ("Judicial economy would not result from the proposed bifurcation because of the overlapping evidence and testimony that will be heard.")

  **B.**  **Holding a Single Trial Would Not Lead to Jury Confusion**

  Much of IBM's argument in favor of bifurcation is premised on its speculation that the jury, already entrusted with the job of determining infringement, invalidity, and damages with respect to the Auburn patents, would nonetheless become confused and unable to properly evaluate the evidence if also asked to make factual determinations relevant to inventorship. (*See* IBM Br. at 5-6). Implicit in IBM's bifurcation motion is the assumption that this case presents particularly difficult or confusing issues for a jury to decide, and thus requires the extraordinary step of bifurcation in order to simplify it. However, the issues in this case are no more complex

14

than are typically found in patent cases, and are well within the ability of a jury to comprehend. As noted above, juries are regularly asked to rule on inventorship challenges, without the need to isolate those challenges in a separate proceeding. *See St. Jude Med.*, 2010 WL 4880806 at *2 n.3 (noting "scores of cases" in which juries have determined the factual issues relating to inventorship claims).

Moreover, the factual issues in this case do not make for a particular difficult evidentiary presentation. There is only a single plaintiff and a single defendant. ████████████ ████████████████████████████████████████████ ████████ And only four patents are at issue. By contrast, it is not unusual for juries to decide cases involving multiple defendants, numerous accused products, and a greater numbers of patents than are implicated in this case. *See, e.g., Masimo Corp. v. Philips Elecs. N. Am. Corp.*, 742 F. Supp. 2d 492, 497 (D. Del. 2010) (denying bifurcation despite the court agreeing with the defendant that it was "a large and complex case with multiple patents, claims, and counterclaims"); *Garmin Ltd. v. TomTom, Inc.*, No. 06-C-0062-C, 2006 WL 3377487, at *1 (W.D. Wis. June 15, 2006) (denying motion to sever counterclaims and noting that "[i]t is commonplace to try multiple patents together" and disagreeing with the defendant that the jury could not "handle the complexities of the trial" involving five patents and multiple products); *SynQor Inc. v. Artesyn Techs.*, No. 2:07-CV-00497-TJW-CE, slip op. at 1-2, 1 n.1, 19-27 (E.D. Tex. Aug. 17, 2011)[24] (ten defendants, five asserted patents, and over 25 accused products); *NTP Inc. v. Research In Motion, Inc.*, No. 3:01cv767, 2003 WL 21212657, at *1 (E.D. Va. March 11, 2003) (listing approximately ten accused products) and 418 F.3d 1282, 1287 (Fed. Cir. 2005)

---

[24] Attached hereto as Exhibit M.

(listing five asserted patents); *800 Adept, Inc. v. Murex Secs., Inc.*, 539 F.3d 1354, 1357 (two patents asserted by plaintiffs, ten patents asserted by counterclaim-plaintiff, four defendants).

Thus, IBM has not provided any basis for concluding that the jury will be confused in this case. However, to the extent that jury confusion is a concern of the Court, it may be addressed by appropriate jury instructions. *See Carter v. City of Phila.*, No. 97-CV-4499, 2000 WL 1368010, at *1 (E.D. Pa. Sept. 12, 2000) (prejudice from a single trial can be adequately addressed by an appropriate jury instruction). For example, IBM speculates that the jury may assume, based on the existence of the IBM patents, that IBM is necessarily practicing the inventions they claim, or is practicing the Auburn patents. (IBM Br. at 5.) Such confusion could be readily prevented by instructing the jury concerning the distinction between owning a patent and practicing a patented invention. In any event, the mere ***possibility*** that jurors might be confused is not a justification for bifurcation. *See Corrigan v. Methodist Hosp.*, 160 F.R.D. 55, 57 (E.D. Pa. 1995) ("the mere possibility of some prejudice does not justify separate trials where such prejudice is not substantial and there are strong countervailing considerations of economy" (quoting *Tri-R Sys. v. Friedman & Son*, 94 F.R.D. 726, 727 (D. Colo. 1982))).

Even if bifurcation was an option, it would do little to alleviate the alleged confusion posited by IBM. IBM argues that the "simultaneous presentation at trial of evidence relating to the Auburn and IBM patents risks confusion amongst the jury as to which evidence is related to Auburn's infringement claims, and which is related to Auburn's inventorship claims." (IBM Br. at 6.) But IBM's argument is grounded in a false dichotomy. As explained above, much of the evidence that would be relevant to Auburn's inventorship claims would also be relevant to Auburn's infringement case and IBM's invalidity defenses.

Nor would bifurcation shield the jury from having to consider what IBM refers to as "complicated legal issues" relating to inventorship. (IBM Br. at 5.) As previously discussed, IBM has already injected the legal issue of inventorship into the case by asserting that Auburn's patents are invalid because Professor Singh and Dr. Barnett are not the true inventors of the Auburn patents, and because IBM's '209 application was allegedly filed prior to any date on which the Auburn inventors invented their invention. (Ex. K at 66, 84.) Thus, whether or not the inventorship claims are bifurcated, the jury will need to be instructed on legal rules relating to invention and inventorship, and will need to choose between Auburn and IBM's factually incompatible inventorship positions.

## IV.   CONCLUSION

IBM has failed to provide any valid justification for bifurcation, which will complicate the presentation of evidence and interfere with Auburn's ability to present all relevant facts to the jury. For all of these reasons and the reasons stated above, IBM's Motion to Bifurcate should be denied.

|  |  |
|---|---|
|  | Respectfully submitted, |
| Dated:  August 22, 2011 | /s/ G. Lane Knight |

**BALCH & BINGHAM LLP**
David R. Boyd (BOYD0717) dboyd@balch.com
G. Lane Knight (KN1028) lknight@balch.com
105 Tallapoosa St., Suite 200, P.O. Box 78
Montgomery, AL 36101-0078
Telephone:  (334) 834-6500
Facsimile:  (334) 269-3115

**FISH & RICHARDSON P.C.**
Jonathan E. Singer (MN 0283459) singer@fr.com
Michael J. Kane (MN 247625) kane@fr.com
Ann N. Cathcart Chaplin (MN 284865)
cathcartchaplin@fr.com
John C. Adkisson (MN 266358) adkisson@fr.com
William R. Woodford (MN 322595)
woodford@fr.com
3200 RBC Plaza, 60 South Sixth Street
Minneapolis, MN  55402
Telephone:  (612) 335-5070
Facsimile:  (612) 288-9696

Juanita Brooks (CA 75934) brooks@fr.com
12390 El Camino Real
San Diego, CA 92130
Telephone:  (858) 678-5070
Facsimile:  (858) 678-5099

Lawrence K. Kolodney (MA 556851)
(kolodney@fr.com)
One Marina Park Drive
Boston, MA 02210-1878
Telephone:  (617) 542-5070
Facsimile:  (617) 542-8906

George L. Kanabe (GA 103906) kanabe@fr.com
1180 Peachtree Street N.E.
Atlanta, Georgia 30309-3513
Telephone:  (404) 892-5005
Facsimile:  (202) 892-5002

**ATTORNEYS FOR PLAINTIFF
AUBURN UNIVERSITY**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of August, 2011, I electronically filed the foregoing with the Clerk of the Court, who will send notice of said filing to all registered parties.

s/ G. Lane Knight<br>
OF COUNSEL